**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 07-CR-0064-CVE** |
| | ) | |
| **MIGUEL MONTES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**OPINION AND ORDER**

Now before the Court is Defendant's Motion to Suppress Evidence (Dkt. # 29).  Defendant argues that "pursuant to the Fourth Amendment of the United States Constitution, the Equal Protection Clause and 42 U.S.C. § 1983 and Federal Rules of Criminal Procedure, Rule 12(b)(3)" the evidence seized on April 3, 2007 should be excluded from trial.  The Court held a suppression hearing on June 7, 2007.  Officer Gene Hise ("Hise"), Officer Ty Owens ("Owens"), and Officer Daran Koch ("Koch") testified for the United States and were cross-examined by counsel for defendant.  Defendant also called Eric Cullen ("Cullen"), a licensed private investigator, as a witness to testify to his observations regarding the site of the traffic stop at issue.  The United States and defendant each submitted several exhibits for the Court's review, the most important of which is the dash camera videotape of the traffic stop.[1]  Upon a review of all the evidence, and for the reasons set forth below, the Court finds that the motion to suppress should be denied.

---

[1]     At the request of both parties, the Court viewed this videotape prior to the suppression hearing.

**I.**

On April 3, 2007, Montes was traveling eastbound on Interstate 44 with a female passenger and two children in a BMW X5.  On Interstate 44, there are toll plazas whereby cars with electronic signaling devices known as pike passes continue straight past the toll area and need not slow down.  Vehicles without pike passes are required to enter the toll plaza, which is to the right of the main roadway.  At mile marker 285, defendant entered the toll plaza to pay the toll in cash.  He traveled in the right lane of the turnpike and then veered to the right as the lane divided at the entry to the toll plaza.

At this time, Hise, a state trooper of the Oklahoma Highway Patrol, was in his patrol car facing westbound in a protected area located to the side of the oncoming traffic.  When defendant's vehicle was approximately one-eighth mile away from him, he noticed that defendant failed to signal a lane change in exiting the Interstate and entering the toll plaza area.  When the car passed him, he observed that the vehicle had a temporary, paper Illinois license plate.  Hise testified that, at that moment, he intended to stop the vehicle for a violation of Oklahoma traffic laws, see OKLA. STAT. tit. 47, § 11-309(2),[2] and that he did not know the race of defendant.  According to Hise, he did not learn that the defendant was Hispanic until he approached defendant's vehicle.  The side windows of defendant's BMW X5 are tinted; however, the front windshield is not tinted.  See Government Exhibit 7.

---

[2]      OKLA. STAT. tit. 47, § 11-309(2) states: "Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following requirements  in addition to all others consistent herewith shall apply.
. . .
(2) A vehicle shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety and then given a signal, not less than the last one hundred (100) feet traveled by the vehicle, of his intention to change lanes."

Hise pulled the BMW over after defendant had passed through the toll both.  At this point, the dash camera had been activated and recorded the traffic stop.  At 12:47 p.m.,[3] Hise exited his car and proceeded toward the passenger side of the BMW.  He saw a female passenger in the front passenger seat and two small children in the back seat.  At this time, according to Hise's testimony, he noticed that defendant was Hispanic.  Hise further testified that he perceived the female passenger to be nervous based on her lack of eye contact and accelerated heart rate.   Hise also noticed that there was a strong odor from two air fresheners and that the vehicle had been recently detailed.  At the suppression hearing, he explained that, in his experience, drug dealers and carriers frequently use air fresheners to mask the smell of drugs.  He also testified that persons transporting drugs in hidden compartments frequently detail the car to rid it of fingerprints and other evidence of drug activity.

Hise asked defendant to follow him to his patrol car.  Defendant complied with his request and walked to the patrol car at approximately 12:48 p.m.   When Hise and defendant were in the patrol car, Hise examined defendant's driver's license.  He confirmed that the car belonged to defendant and asked defendant about his failure to signal a lane change.  Defendant informed Hise the he normally signaled when changing lanes, but did not do so on this instance.  Hise asked defendant several more questions, including when he bought the BMW X5 and where he lived.  Defendant informed Hise that he purchased the vehicle three months earlier and that he resided in Little Rock, California.  Because the car had a temporary Illinois license plate, Hise asked defendant whether he purchased the car in Illinois, and defendant answered in the affirmative.  Hise then

---

[3]      The Court bases the times set forth in this Opinion and Order on the time reflected in the dash camera videotape.

proceeded to ask defendant how to pronounce and spell his name and what his California address was. After a brief conversation about defendant's weight and the gas mileage of the car, defendant informed Hise that he had been living at his California address for approximately one year. At 12:52 p.m., Hise asked defendant where he was traveling to, and defendant responded that he was headed to Illinois for spring break. Hise inquired as to why defendant bought the car in Illinois since he resided in California. Hise also began to fill out the warning citation at 12:52 p.m.[4]  See Government Exhibit 4. Although a majority of the warning citation is filled out, Hise never gave the citation to defendant because of subsequent events.

Hise then asked defendant what he did for a living, and defendant responded that he was in the landscaping business. Hise informed defendant that he (Hise) had owned and sold a landscaping business. Then, at approximately 12:53 p.m, Hise made a call to dispatch to conduct a license check. During the time that dispatch was conducting the license check, Hise asked defendant questions about his landscaping company, including the number of employees in the company, the types of jobs defendant did, the consistency of California soil, the type of grass used in California, etc. At the suppression hearing, Hise testified that he found defendant's landscaping knowledge to be questionable.

Hise then asked defendant if he had ever been arrested, and defendant responded that he had been arrested about ten years ago. While defendant was explaining his prior arrest, at approximately 12:58 p.m., dispatch reported back and informed Hise that defendant's driver's license was valid and that defendant was not wanted for any crime. Dispatch confirmed that defendant had been charged

---

[4]     Hise filled out the time on the warning citation based on the clock in his patrol car. He could not view the time displayed on the dash camera during the traffic stop. Thus, it is possible that his patrol vehicle's clock varied slightly from the dash camera time.

with possession for sale of marijuana in 1997 and that the charge had been dismissed based on defendant's plea to another charge.  The dispatch report lasted for approximately one minute.

At the suppression hearing, Hise testified that he found defendant to be unusually nervous. He explained that most people become less nervous when they learn that they will receive only a warning citation.  However, Hise testified that he could see defendant's stomach muscles twitch, his hands sweat, and this heart beat rapidly.  This nervousness continued throughout the encounter.

At 12:59 p.m., Hise asked to see the vehicle registration and went to the passenger side of the vehicle to obtain the registration.  However, the female passenger did not speak English and did not understand Hise's request.  Defendant then accompanied Hise to the vehicle and retrieved the registration.  By this time, Officer Owen had arrived and stood at the rear of the BMW.  When defendant and Hise returned to the patrol vehicle at 1:01 p.m., Hise asked Owen to run a drug-detection dog around the BMW.  When defendant and Hise were back in the patrol car, Hise asked defendant about the Illinois address listed on the registration.  Defendant responded that it was his friends' address.

As requested, Owen walked his drug-detection dog around the car.  During the "free pass"[5] of the vehicle, the dog's behavior changed around the front passenger side of the BMW. Specifically, at 1:02 p.m, immediately after passing the front passenger area, the dog paused and turned around to head back to the passenger side of the car.  According to Owen, this change of behavior is an indicator that the dog senses the presence of drugs.  Owen continued to walk the dog around the BMW to complete the free pass.  When it walked by the front passenger window again,

---

[5]      According to Owen and Hise's testimony, a "free pass" is when the canine handler walks the dog around a vehicle one time for an initial check.

the dog aggressively alerted by scratching and jumping.  This "aggressive alert" occurred at 1:03

p.m.  Officer Koch arrived at approximately this time.

While Owen walked the dog around the vehicle, Hise continued to ask defendant about the

Illinois address on the registration.  Hise asked why defendant did not have a California address on

the registration.  Because the BMW was in front of Hise's patrol vehicle, both defendant and Hise

could witness the  dog's behavior.  After the drug dog alerted aggressively, Hise asked defendant,

"you don't mess with any drugs or anything right now, are you?"  Defendant responded in the

negative.  Hise told defendant that, "it's pretty obvious to me what his dog is doing, he's alerting

to your car for illegal drugs, OK?  Will there be anything like that in there right now?"  Defendant

responded in the negative.  Hise informed defendant that the dog alert gave him probable cause to

search the car.

Prior to the search, the female passenger and two children moved from the BMW to Hise's

patrol car.  Hise, Owen, and Koch conducted a search of the car beginning at approximately 1:09

p.m.  After searching for several minutes, the officers brought the drug-detection dog back to the

vehicle at 1:17 p.m., and the dog again alerted aggressively to the presence of drugs.  Underneath

the front passenger seat, the officers finally saw bags that they believed to contain drugs.  They

removed the seat from the car, and ultimately recovered nineteen kilograms of cocaine.

On April 4, 2007, defendant was charged in the Indictment (Dkt. # 2) with possession with

intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and

(b)(1)(A)(ii).

**II.**

Before turning to the motion to suppress, the Court sets forth the procedural history of this case.  On May 23, 2007, defendant sought and the Court issued a subpoena seeking the reports, records, intra-office communication, warning tickets, memoranda, and writings of the Oklahoma Department of Public Safety or the Oklahoma State police concerning warning tickets issued by Hise, Koch, and Owen to African-American, Hispanic-American, and American-Indian motorists at mile marker 285 at Interstate 44.  See Dkt. # 33-2.  The United States filed a motion to quash (Dkt. # 33) on June 30, 2007.  Magistrate Judge Sam A. Joyner held a hearing on June 4, 2007 and granted the motion to quash.  See Dkt. ## 41, 42.  Judge Joyner held that defendant failed to meet the threshold requirement of showing "some evidence tending to show the existence of the essential elements of the . . . defense, discriminatory effect and discriminatory intent."  Dkt. # 42, at 1 (quoting United States v. James, 257 F.3d 1173, 1178 (10th Cir. 2001)). Thus, the Court concluded that defendant was not entitled to the discovery.

**III.**

In his motion to suppress, defendant argues that the initial stop of defendant's vehicle was unlawful.  Even if the initial stop were lawful, defendant argues that the officer unlawfully exceeded the scope and length of the detention.  Finally, he contends that the officer did not have reasonable suspicion to warrant an expansion of the stop beyond its original purpose.   The Court addresses each of these arguments below.

A.     The Initial Stop

A traffic stop is a seizure under the Fourth Amendment.  United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995) (en banc).  "The validity of a traffic stop under the Fourth

Amendment turns on whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." United States v. Tibbetts, 396 F.3d 1132, 1137 (10th Cir. 2005) (quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)); see also United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998); Botero-Ospina, 71 F.3d at 786.  The standard is an objective one; the subjective motivations of the officer are irrelevant.  Whren v. United States, 517 U.S. 806, 810-18 (1996); United States v. Manjarrez, 348 F.3d 881, 884 (10th Cir. 2003); Botero-Ospina, 71 F.3d at 787.

The Tenth Circuit has held that officers can stop a vehicle for failure to signal when exiting the interstate and entering a toll booth area.  In Manjarrez, the defendant was traveling along a toll road in Oklahoma and was stopped because he "failed to signal when [the vehicle] exited the interstate into the toll plaza and failed to signal again when it changed lanes and proceeded towards the toll booth."  348 F.3d at 884.  According to the Tenth Circuit:

> The district court . . . concluded that "[b]ased on the video evidence, leaving the turnpike to go on to the toll plaza is leaving a lane as contemplated by Oklahoma statutes and therefore, precipitates an obligation to signal."  We agree, and note that a signal is required when exiting the interstate.

Id. at 885.  In United States v. Richardson, 2007 WL 172192 (10th Cir. Jan. 24, 2007)[6], the defendant was stopped "based on the driver failing to signal when branching off from the turnpike into the toll plaza."  Id. at *1.  Although the Richardson court found Manjarrez somewhat troubling in its breadth, it ultimately found that Manjarrez was controlling and thus the initial traffic stop was

---

[6]     The Court is aware that citation of an unpublished decision is disfavored. 10th Cir. R. 36.3. However, this unpublished decision has persuasive value on a material issue and assists the Court in its disposition of this issue.

valid.  Likewise, the Court finds that <u>Manjarrez</u> is controlling and that Hise's stop of Montes' vehicle was valid.

B.    <u>Pretext</u>

Before turning to defendant's argument concerning the length and scope of the traffic stop, the Court addresses defendant's assertion that Hise's stop was merely pretextual.  According to defendant, Hise actually pulled defendant over because he was Hispanic and driving an expensive vehicle.  He explains,

> The false claim of failure to use a turn signal at the above place and location, by law enforcement officers, based upon motorists' race and ethnicity constitutes selective enforcement of the law, in violation of the Equal Protection Clause and 42 U.S.C. § 1983 . . . .  The belief of Trooper Hise, and the Oklahoma Highway Patrol, that a Hispanic or Mexican American, in a luxury vehicle with a Hispanic or Mexican passenger or passengers – without any other evidence – is part of a drug cartel, and are thus narcotics traffickers, violates the Equal Protection Clause and § 1983, as well as violates the Fourth Amendment Protection against unreasonable search and seizure.

Dkt. # 29, at 5.

The "Constitution prohibits selective enforcement of the law based on considerations such as race."  <u>Whren v. United States</u>, 517 U.S. 806, 813 (1996). However, as the Court made clear in <u>Whren</u>, a claim of selective enforcement is properly brought under the Equal Protection Clause.  <u>Id.</u> "[T]he fact that [d]efendant may have an equal protection claim against the arresting officer has absolutely no bearing on whether the officer's traffic stop was reasonable under the Fourth Amendment."  <u>United States v. Adkins</u>, 2001 WL 15537, *1 (10th Cir. Jan. 8, 2001).  So long as the traffic stop was objectively reasonable, the subjective motivations of the officer are irrelevant in determining the validity of the stop under the Fourth Amendment.  See <u>Botero-Ospina</u>, 71 F.3d at

787.  Here, as discussed above, the officer had an objective reason for stopping defendant; thus, the initial stop was valid under the Fourth Amendment.

In his motion to suppress, defendant raises his selective enforcement claim under the Equal Protection Clause as well.  At the suppression hearing, however, Hise testified that he did not know defendant's race prior to effecting the stop.  Counsel for defendant attempted to undermine Hise's testimony in noting that the front windshield of the BMW X5 is not tinted.  Further, Cullen testified that he was able to identify the race, sex, and age of vehicle occupants at the toll booth plaza in question.  The Court finds defense investigator Cullen's testimony concerning his ability to identity the race of occupants remarkably unhelpful in determining whether Hise was able to identify the race of defendant in the BMW X5 for at least the following reasons: (1) Cullen was not positioned in the same location as Hise; (2) it is unclear whether Cullen and Hise have the same or similar eye sight; (3) Cullen did not observe any BMW X5s; and (4) Cullen testified that he was unsure whether he would have been able to determine an occupant's race if the vehicle had tinted windows.  The Court finds that Hise's testimony that he did not know defendant's race prior to stopping the vehicle was credible.  Thus, defendant's argument that he was targeted on account of his race is foreclosed. See United States v. Alcaraz-Arellano, 441 F.3d 1252, 1265-66 (10th Cir. 2006) (holding that the district court's credibility finding that the officer did not know the defendant's race prior to effecting the stop foreclosed his selective enforcement argument).  Further, this factual finding buttresses Magistrate Judge Joyner's opinion that defendant was not entitled to discovery based on his failure to establish "some evidence" of discriminatory intent.  See id. at 1264-66 (holding that the standard set forth in James applied to selective enforcement actions and noting that the district court's factual-finding supported the denial of discovery on the selective enforcement issue).

10

C.     Length and Scope of Detention Based on Initial Traffic Stop

Defendant argues that Hise unlawfully detained him beyond the time it took to effectuate the purposes of the stop; thus, the stop was an unlawful seizure.  A traffic stop is reasonable if (1) the officer's action was justified at is inception, and (2) the officer's action was reasonably related to the circumstances which justified the stop in the first place.  See United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005).  An officer conducting a traffic stop may request a driver's license, vehicle registration, run a computer check, and issue a citation.  See United States v. Zubia-Melendez, 263 F.3d 1155, 1161 (10th Cir. 2001).  An officer may also "ask questions about the motorist's travel plans and authority to operate the vehicle" in addition to obtaining the relevant documentation.  United States v. Alcaraz-Arellano, 441 F.3d 1252, 1258 (10th Cir. 2006).  Beyond these specific questions, the Tenth Circuit has held that, in light of Muehler v. Mena, 544 U.S. 93 (2005), as long as the police questioning does not extend the length of the detention, there is no Fourth Amendment issue with respect to the content of the questions.  United States v. Wallace, 429 F.3d 969, 974 (10th Cir. 2005); Alcaraz-Arellano, 441 F.3d at 1258.  However, once the purpose of the stop is satisfied, the driver's detention generally must end without undue delay.  United States v. Edgerton, 438 F.3d 1043, 1047 (10th Cir. 2006).

Here, the Court conducted a close review of the timing involved in this traffic stop and finds that the length of the detention prior to the alert was reasonable and that Hise's actions were reasonably related to the stop.   Prior to the dog alert, defendant was detained for approximately sixteen minutes (from 12:47 p.m. to 1:03 p.m.).  During this time, Hise asked questions about defendant's name and other information on his license. He inquired as to defendant's travel plans and his authority to operate the vehicle. Further, between 12:53 p.m. and 12:58 p.m, Hise waited

11

for dispatch to report on the license and background check. It was during this waiting period that most of the conversation concerning landscaping occurred.   Further, it took approximately one minute for dispatch to relay the information concerning defendant's license and criminal history. Upon receiving this information, Hise proceeded to request the vehicle registration.  It took some time to obtain the registration, and Hise reasonably asked defendant questions about the information contained therein.  The Court finds that Hise acted diligently and did not "unnecessarily prolong[] [the] detention." United States v. Sharpe, 470 U.S. 675, 685 (1985).  Thus, the traffic stop prior to the dog alert was reasonable and within the legitimate scope of the traffic stop.  See, e.g, United States v. Patterson, 472 F.3d 767, 776 (10th Cir. 2006) (traffic stop lasting 13 minutes and 27 seconds prior to the dog alert was not unreasonable); United States v. Biseno, 2006 WL 12248 (10th Cir. Jan. 18, 2006) (police officers did not impermissibly extend the duration of the traffic stop where the process took no more than 19 minutes); United States v. Garner, 2003 WL 21465499 (10th Cir. June 25, 2003) (15 minute lapse of time from the stop of the vehicle to the time the officer issued a warning citation did not constitute unlawful detention).

D.    Reasonable Suspicion to Extend the Length of Detention

        Given that the length of the initial stop before the canine alert was reasonable, the Court need not inquire as to whether the troopers had reasonable suspicion of other criminal activity.  See Patterson, 472 F.3d at 778 (determining that the court need not consider whether the defendant's demeanor or anything else gave the troopers reasonable suspicion to detain him prior to the dog alert because the length of the traffic stop itself was reasonable).  However, the Court also finds that, even if Hise had detained defendant beyond the time necessary to effectuate the traffic stop, Hise had reasonable suspicion to prolong the stop.

12

It is well established that a detention that extends beyond the scope of the traffic stop is reasonable if prolongation of the stop was supported by reasonable suspicion.[7]  See Wallace, 429 F.3d at 974.  Reasonable suspicion is a "particularized and objective basis for suspecting the person stopped of criminal activity." Ornelas v. United States, 517 U.S. 690, 696 (1996) (internal quotation marks omitted).  An "inchoate and unparticularized suspicion or 'hunch' is insufficient" to support reasonable suspicion.  United States v. Hall, 978 F.2d 616, 620 (10th Cir. 1992) (internal quotations and citations omitted).  Reasonable suspicion "represents a minimum level of objective justification which is considerably less than proof of wrongdoing by a preponderance of the evidence." Alcaraz-Arellano, 441 F.3d at 1260 (quoting United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997)).  In determining whether an officer had reasonable suspicion of criminal activity, the Court does not evaluate the facts in isolation but instead construes them together based on the totality of the circumstances.  United States v. Arivizu, 534 U.S. 266, 274 (2002).

Here, at the suppression hearing, Hise presented a list of factors which he claims contributed to his reasonable suspicion that criminal activity was afoot:

- the odor and presence of air fresheners

- the passenger's accelerated heart rate

- the passenger avoiding eye contact

---

[7]  Prolongation of the stop is also justified if the encounter is consensual.  See United States v. Elliott, 107 F.3d 810, 814 (10th Cir. 1997).  Consent is not an issue in this case.

- only one key in the ignition[8]

- the car was freshly detailed

- defendant was associated with multiple addresses

- defendant appeared to hesitate during general conversation

- defendant appeared physically nervous based on his quivering stomach muscles, sweaty palms, and accelerated heart rate, even after he was told that he would only be receiving a warning citation

- defendant's knowledge about landscaping was questionable, even though defendant stated that he owned a landscaping business

- defendant's previous criminal arrest

- the vehicle was registered in Illinois, but defendant resided in California and had a California license

- the cities between which defendant was traveling were "hub" cities for drug activity

- the BMW X5 is known to have vacant compartments which are used to store drugs in high-end drug smuggling rings

The Court recognizes that each of these factors, in insolation, does not support reasonable suspicion and that some of the factors are only minimally relevant in the reasonable suspicion analysis. See, e.g., United States v. Laughrin, 438 F.3d 1245, 1248 (10th Cir. 2006) (knowledge of

---

[8]    Officer Hise explained that the presence of a single key in the ignition (as opposed to a key chain with multiple keys) is an indicator that the car is borrowed or rented.  The Court finds this factor of very limited significance in the reasonable suspicion analysis.  See Mendez, 118 F.3d at 1431 ("[S]ome facts are so innocuous and 'so susceptible to varying interpretations' that they carry little or no weight.") (quoting United States v. Lee, 73 F.3d 1034, 1039 (10th Cir. 1996)).

14

a person's prior criminal record is alone insufficient to establish reasonable suspicion);  United States v. Santos, 403 F.3d 1120, 1132 (10th Cir. 2005) ("Even people with prior convictions retain Fourth Amendment rights; they are not roving targets for warrantless searches.  But in conjunction with other facts, criminal history contributes powerfully to the reasonable suspicion calculus"); id. at 1227 ("nervousness is a sufficiently common – indeed natural – reaction to confrontation with the police" and is of "limited significance" in a reasonable suspicion analysis, but "extraordinary and prolonged nervousness can weigh significantly in the assessment of reasonable suspicion"); id. at 1132 (courts should not place too much emphasis on travel to common destinations because "[o]ur holding that s*uspicious* travel plans can form an element of reasonable suspicion should not be taken as an invitation to find travel suspicious per se") (emphasis in original); United States v. Villa-Chaparro, 115 F.3d 797, 802 (10th Cir. 1997) (scent of air freshener, standing alone, is inadequate to support reasonable suspicion).  However, as noted above, the Court views these factors in totality. The Tenth Circuit recently explained,

> Factors, which when taken separately may be perfectly innocent behavior, can support a finding of reasonable suspicion when taken together. Conversely, although the nature of the totality of the circumstances makes it possible for individually innocuous factors to add up to reasonable suspicion, it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.  In analyzing the factors that may amount to reasonable suspicion, we must be careful to judge the officer's conduct in light of common sense and ordinary human experience but also to grant deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances.

United States v. Ramirez, 479 F.3d 1229, 1244 (10th Cir. 2007).

Here, the Court finds that Hise had sufficiently concrete reasons for suspecting criminal activity.  The factors that contribute most to this finding are: the defendant's association with multiple addresses, the fact that vehicle was registered in Illinois although defendant was a

15

California resident, defendant's vague and elusive answer as to why the car was registered in Illinois, the fact that the car appeared to have been recently detailed although it was a relatively new car, defendant's continued and prolonged nervousness,[9] and defendant's criminal history. These more concrete reasons, combined with the "individually innocuous factors," add up to reasonable suspicion.

The Tenth Circuit has previously held that a delay of thirty-eight minutes awaiting the arrival of a canine unit, Villa-Chaparro, 115 F.3d at 802-03, and a fifty minute detention while engaging in a canine search, United States v. Cervine, 347 F.3d 865, 872-73 (10th Cir. 2003), were lawful based on reasonable suspicion. Thus, a sixteen minute detention prior to the dog alert is certainly reasonable based on the officer's reasonable suspicion of criminal activity.

E.     Search of the Vehicle Following the Dog Alert

"A canine sniff itself does not implicate Fourth Amendment rights because of the limited information it provides and its minimal intrusiveness." Hunnicutt, 135 F.3d at 1350 (citing United States v. Place, 462 U.S. 696, 707 (1983)); United States v. Ludwig, 10 F.3d 1523, 1527 (10th Cir.1993). The Supreme Court has held that the use of a drug-sniff during a lawful traffic stop is not unconstitutional where the sniff does not extend the length of detention. Illinois v. Cabelles, 543 U.S. 405, 408-09 (2005). Here, as discussed in Section III(C), the length of the detention was reasonable, and the drug-detection dog alerted while Hise was examining the registration. Even if

---

[9]     It is difficult to ascertain defendant's level of nervousness from the videotape because the videotape does not depict defendant's visual signs of nervousness. At the suppression hearing, Hise testified that defendant showed several physical signs of nervousness and that his nervousness persisted throughout their encounter. Specifically, Hise could see defendant's heart beating quickly, his stomach muscles twitching, and his palms sweating. The Court finds Hise's testimony concerning defendant's physical signs of nervousness to be credible.

16

one were to find that Hise prolonged the stop, he had reasonable suspicion to justify the lengthier stop. Thus, the use of the drug-detection dog was lawful.

Once the drug-detection dog alerted, the officers had probable cause to search the vehicle without a warrant. See United States v. Rosborough, 366 F.3d 1145, 1153 (10th Cir. 2004); United States v. Stewart, 473 F.3d 1265, 1270 (10th Cir. 2007) ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained.") (quoting California v. Acevedo, 500 U.S. 565, 580 (1991)).

F.     Summary

The Court finds that the initial stop was valid based on defendant's violation of OKLA. STAT. tit. 47, § 11-309(2). Hise's officer's actions were reasonably related to the traffic stop, and the sixteen minute detention was lawful. Based on the Court's finding that Hise's testimony that he did not know defendant's race when he initiated the traffic stop was credible, the Court finds that defendant was not the victim of selective enforcement of the traffic laws on the basis of his race. Also, even if the length of the stop were prolonged beyond the purpose of the initial stop, Hise had reasonable suspicion to warrant the slightly lengthier detention prior to the dog alert. Finally, as soon as the dog alerted to the car, the officers had probable cause to conduct a search. It follows that the motion to suppress should be and is hereby denied.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress Evidence (Dkt. # 29) is hereby **denied**.

**DATED** this 13th day of June, 2007.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE